Good morning, Your Honors. Please the court that I represent the petitioner, Mr. Lai, on this case. Your name is, sir? Thomas John Tirigo, for the record. The respondent, actually the petitioner, actually came to the United States after being persecuted by the Chinese government for actually practicing Christianity in an underground church. He testified credibly and consistently to his arrest, his detention, and his beatings. However, on cross, it was raised that he failed to include facts in his statement pertaining to his wife's arrest and to other church members who were arrested after he came to the United States. The IJ found that this inconsistency actually goes to the, this was affirmed by the BIA as well. However, if you look at this inconsistency, you must look at the fact that how it came to be in the totality of the circumstances under CESTRA. In this case, the respondent actually had clarified for the record when the judge asked him and put him under oath, is everything true and correct? And he said, yes, everything is true and correct. Is there any changes? No. So when he heard true and correct, he thought in the inference and in the instance, that meant that the corrections, was there anything incorrect in his statement or in his application? Later on, the judge, after hearing him on cross, said, I had told you, did you want to update your application? And Mr. Lay said, well, I thought you meant everything to be true and correct, not anything else. And I'm sorry, I misunderstood. Well, with that, you look at the totality of circumstances under CESTRA, it is plausible that somebody can misunderstand the judge when giving the instructions, is everything true and correct versus everything updated? The BIA goes on to argue and say, well, he was given a chance and put under oath as to accuracy, but in actuality, there's nothing in the statements by the judge saying, is everything in your application updated and accurate? Are any additions? They went to say that these omissions actually affect the actual case and that these omissions should be used, again, for credibility. However, under Moussa, basically that applicant for that petitioner had failed to mention about her injuries, basically her healing leg or the infection in her leg. This Court has held that the actual petitioner was never actually asked the questions about her healing of her leg, was not given actually any direct questioning about that process. Well, in this case, same here, the petitioner was never asked on direct whether or not his family was ever arrested, his family was ever timing. If you look at when the actual asylum application was filed and versus when it was filled out, the respondent soon thereafter, him coming to the United States, approximately 12 to 15 days, actually fills out his application and does his statement and signs it. However, it was not received until several months later, I think in 2006, where he actually states, you know, he doesn't know when it was, who actually was dealing with this application and how it was filled out or if it was actually read back to him. While in the Anaheim Asylum Office, every amendment was made at the time that he actually had amendments and corrections. Thereafter, these events that unfold come after he's been in court and literally, for his wife's arrest, was determined only several days to four days prior to the actual hearing. As far as the arrest of the other church members, it was never established in the record what timeframe he learned of that or when he made the phone call back to China. So we can't infer if he actually had a lot of time or a little time or if it was right before the hearing. However... Counsel, in that regard, the IJ went on to ask at ER or AR, whatever, 135, do you have any of this paperwork showing that she was arrested? And he says no. And then the IJ asks, I assume it's the IJ, and is she now attending weekly visits? Does she now have to go to weekly meetings at the police station? Yes. And do you have any paperwork showing this, sir? No. Was there any effort made to ask for a continuance to get corroboration? Was there any discussion of corroboration to establish these events that have recently happened? Well, interesting that you say that, because the judge in Wren is actually the same judge in this case. The judge in which? In Wren, in Holder v. Wren. And in Wren, the respondent was given opportunity by the judge. But there was no discussion, to answer your question. There was no discussion of it. I believe at that moment... Counsel didn't ask for time to get corroboration? No. And has there been any effort made to get corroboration? Well, at that point, the case was continued. And at that point, I can't speak on behalf of the actual counsel who did the trial and what efforts he had done. But I do think that the respondent should have been placed on notice by the judge, as she did in Wren. But of course, that case didn't exist at the time. But if given the opportunity now under Wren, as required and notice, I think the client would be able to present that documentation. It was actually put in the record by the judge that, and misstated, actually, that he had a month's notice to get these documents, because she was arrested technically a month earlier than the final proceedings. However, the judge fails to actually note that he only learned of this a couple of days prior to the trial. So, even then, I mean, at that point, if the judge was actually going to accept more evidence, she would have said and given noticing, Well, sir, petitioner, I think this is a very important fact that she states on the record. Don't you think? And why don't you have this evidence? And, well, at that point, I think the judge is in a better position to advise the respondent that I'm going to continue this case and say, I want to see this evidence, in order to have a full and fair hearing under the Fifth Amendment as required and stated in Wren. But more importantly, I look at the totality of the record. I look at the judge's approach to the case and how she evaluated all the evidence. She did cherry-pick a lot of the evidence to actually sustain a negative credibility finding. For instance, she states in the record on her decision, the exit and entry standards in the actual country conditions would not allow Mr. Lye to have left. However, she never looks at the totality of the fairness of all of the evidence, and she never goes to the, actually, Exhibit 6, which is the religious reports, which on technically page 163, 162, and 161 of the record, show continuously from 2005 to 2008 religious persecution to groups, and it's similarly situated to the respondent. Now, that is, if not corroborating evidence in and of itself, why didn't the judge actually put that on the record to be fair? You mean in addition to noting that he couldn't have got out of the country if he was in trouble for practicing his religion? She should have mentioned that? Correct, because under the totality of the circumstances, she has to actually relate to the other relevant factors that would actually overcome a negative credibility finding as well. Aren't they two separate issues, though? I don't think they're two separate issues. Whether he could exit if he was in trouble for practicing religion, or whether people are not allowed to practice religion? Right. Substantively, you're right. There are two separate issues, but if you look at the totality of the circumstances, in balancing everything, in credibility, she never considered the positive factors. Go ahead with your other evidence of cherry-picking. The other evidence of cherry-picking that she basically says that he's a Christian of convenience. Unfortunately, he fails to mention that in the record he testified that he tries to get to his church meetings and actually takes breaks from his work and shows up late because he goes on his lunch hour. She actually goes and says, well, you left your country, you left your family, religion is the most important thing to you. But never fails the positive factor that he's trying his best because of the type of work he does doesn't allow him to give up means of survival or pain for himself, and this is not steady work. But he tries his best, and he shows up late. She never puts that positive factor in there as well. Additionally, she cruises over the cursory view that she actually states that his statement and his testimony are mirror image, but never goes over that that's credible, that goes to credibility. All right. Well, you're well over your time, so let's hear from the government. Thank you. Good morning, Your Honors. Timothy Hayes on behalf of the Attorney General. All right. So are we reviewing the BIA's decision or the IJ's decision here? Both, Your Honor. Okay. The board referred to the IJ's decision, and generally when you're discussing an adverse credibility finding, it's a factual finding, so the IJ's decision will always come into play.  and all relevant factors. A trier fact may base a credibility determination on the consistency between the applicant's written and oral statements and the consistency of such statements with other evidence of record, including the reports of the Department of State, without regard to whether an inconsistency goes to the heart of the applicant's claim. And that's what the immigration judge. So the BIA said particularly significant is an inconsistency with respect to the arrest of the respondent's wife in China. Why is that an inconsistency when at the time he prepared the statement, she hadn't been arrested? Well, they're discussing an inconsistency between the time of when he submitted the application to the immigration judge and between the time when he testified and processed the information. Wasn't she not arrested until after that statement was prepared? Well, the written document was prepared before the asylum officer, so that was about a year before the merits hearing. But at the beginning of the merits hearing, he was asked whether his application is true and correct. It was. It was. It was true and correct. And the wife being arrested was a subsequent event. Are you not allowed to testify to subsequent events? Of course you are, Your Honor. But the applicant is well aware that they're going to compare what is written on the application to the testimony, and that's going to go to his credibility. Well, that seems like games playing. I mean, you prepare this declaration. I mean, think about you preparing a declaration and submitting it to a court. And between the time the thing's submitted and you actually go testify, some new event occurs. Are you to be branded a liar for that? Your Honor, if you're counseled and about 18 months have passed between the time the declaration was submitted and you're asked whether everything in here is still true and correct. But that's not what he was asked. He said, is that true and correct? It doesn't have to be. He's not asking him whether there's new information or subliminal information. I agree. The immigration judge should have asked, is it true, complete, and correct. Yes, that's what they usually ask. And that was what struck me as being odd in this case was she didn't use the word complete. Yeah, usually they ask complete. And that's when usually they'll say, well, since then, these other things have happened. Exactly. Okay, counsel, just to put another framework on it, yesterday we had a similar case. Okay. Where the evidence comes out in response to questions, in that case by the AHA. What I was reading earlier, it was questioning on cross-examination, not by the immigration judge in this case. But the posture is the same. And the explanation is the same. And that is, in this case, not only is there the point Judge Wardlaw has made, but is the point that it didn't come out on direct examination. And that is noted by the IJ. The nature of the evidence in this case and in the other cases, information about what happened to other people other than the testifying petitioner responded below, I understand. So it's positive information for their case. It's information that would have enhanced their claim for persecution. So what's the motive on the part of a petitioner for asylum to omit evidence of matters that happened to other people that the IJs and the board would view as helping their case? If that's the situation, it's positive evidence. It's not suddenly changing the circumstances, omitting things that were major events that could have been put in the application. Here is an event that could have two events that could have enhanced the case. Now, when asked why it wasn't put in, as counsel recited, the response was, I was saying what was before the court was accurate. It was accurate. And we're dealing here with a situation where these petitioners are saying, when you ask me whether my application about harms that happened to me, yes, it's accurate. It's even complete. And in this case and in the one we had yesterday, the response of the explanation was, I was talking about myself. These other things happened in this case to my mother. So I don't understand why that undermines the credibility. I will say that omissions as far as discrepancies are probably the weakest type. It's not a direct inconsistency. But as far as your question as to motive, the immigration judges are trying to sift through to see if there's a script. We all know that a lot of these asylum applications are fraudulent or they're following a script provided to them by someone. I asked a similar question of the same government attorney for the same case, Judge Fisher. I understand that there is basis from the country conditions reports for these types of claims where people are practicing it, because that's what's happening in China. It's a true fact. The question that the IJs are trying to find out is, did this really happen to the person who I have in front of me? I don't see any inconsistencies in this case. I see supplemental. I don't even see omissions, because how can you omit something when it hasn't happened yet? So I think the IJs have to be a little bit – I understand they're rejecting a lot of these claims because it's hard, given what's out there in the country condition reports, to be able to be sure that who's telling the truth and who's not telling the truth and are they represented by a counsel with integrity or not a counsel with integrity. So I understand the difficulty of their job. My concern is that making adverse credibility determinations out of nothing, out of supplemental stuff that actually enhances their case, it shouldn't be the basis, even under the Real ID Act. I think the case is close, but I do disagree where – I agree that this would enhance their claim, but what they're trying to get at is, is it part of the script or is it not? Yeah, but why – it's not part of the script, because if it had been part of the script, it would have come out on direct examination. This came out on cross. They had no plan evident on the face of it to make this an enhancement that was part of the script, that they said, oh, by the way, you've got to beef up your case by putting in information about your mother's arrest or what happened to your – if that were the script, it would have come out on direct. But both of these came out on cross from the government attorney. So where's the script motivation? I mean, there are some interesting aspects in the testimony, not particularly that one, but later, you know, there was a lot of this discussion about whether he prioritizes work over church activities. Let's talk about these two, because these are the two that the I.J. relied on. An external discrepancy. Well, maybe, but I'm looking at what she said. She recites what happened, and then she starts off by saying, I have serious reservations about the veracity. While Respondent's direct testimony generally mirrored the information, during cross-examination, he testified to additional key events. Well, where's the script? I think she was concerned where he was counseled before her. Counsel spent an inordinate amount of time on direct, pulling out information, and this is a key part that he knew about four days before the hearing took place. Maybe he hadn't even told his counsel because he didn't think it pertained to his claim for relief. But it's his wife. He's talking to his wife on the phone. She's saying, you know, honey, the police are after me because of you. I mean, that's exactly why he claimed that she said she has to check in once a week, because of him, not because of her. Well, but what's, counsel, you are just, I understand what you're trying to do, and I've sat in the immigration court before and with this judge, so I have great respect for her as I've observed these things. But I'm, you know, looking at the transcript. That's what we have to go on. And I know we owe great deference. But the logic of it, when it's coming out on cross-examination, doesn't make sense. Because if he's pulling all this out to make his case and enhance it, those cases we see and we understand. But two of these cases now, yesterday and today, the favorable information comes out on cross-examination. They didn't proper it. And both of the explanations was, well, you asked me if what I've accounted for is true, accurate, and complete. And in this case, it didn't even say complete. So those answers are correct. And the answers, and maybe these are coached answers, but they both say, in effect, I was responding to what happened to me, the harms that happened to me. And these are not harms that happened to him. I see your point. I'm a little over time. No, we've been using the time. It's an important issue. I mean, I understand your point, I do. But the part where I disagree, and we've been through this before at the other hearings, but I do think it's relevant to his claim, even if it's to him. Because the reason why his wife was harmed was because of him. It may be relevant, counsel, but why is it a credibility issue? Because it goes to how thorough the claim is up front. Is it true, complete, and correct? But he wasn't asked that question. He wasn't asked complete. He had the interpreter issue in this case. Yeah, there were interpreter issues. Right. And I'll tell you, one of the things in this case that really offended me was this. The evidence demonstrates that the respondent is, at best, a Christian of convenience. Because you wouldn't see that. Yeah, I didn't like it either. That was terrible. Because I personally sometimes have to travel on Sundays to get to where I have to go to sit for the week. And I otherwise would be at Mass once a week. But I sometimes have to miss Mass because I have to get on a plane and go somewhere in the Ninth Circuit to hear cases. And I thought, so am I a Christian of convenience? Or am I trying to both do my job and practice my religion? I think where she was coming from is the part that he left his family, too. I mean, he left so much in order to kind of follow his religion. Well, maybe he was thinking he could get here, become a citizen, and then bring his family over. It would take several years to become a citizen even if it was granted asylum. Well, it does. It does. And that's how my Scottish grandparents immigrated. Different era. Different era. But that's what they did. Well, thank you very much, Your Honors. Thank you for your dialogue. Yes. You're using because, as you know, we get so many of these cases. We see a whole stream of them. So we have a context in which to frame these concerns. And, as you said, we've had two now where the evidence that's being used against them is elicited by cross, and it's favorable to the petitioner to have had that information, and it's puzzling why that would be withheld and puzzling then why it would be a credibility factor. I don't know if you can get that kind of information or advice from Judge Fischer to the immigration judges, but it might be helpful. We will. We have training. Okay. Thank you very much, counsel, both counsel. Lye v. Holder will be submitted.
judges: Dawson, Wardlaw, Fisher